```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                                   :
ERMARIS BIO, PBC,                                                  :
                                                                   :
                        Plaintiff,                                 :
                                                                   :
              -v-                                                  :    25 Civ. 3691 (JPC)
                                                                   :
THE TRUSTEES OF COLUMBIA UNIVERSITY IN                             :    OPINION AND ORDER
THE CITY OF NEW YORK,                                              :
                                                                   :
                        Defendant.                                 :
                                                                   :
-------------------------------------------------------------------X
```

JOHN P. CRONAN, United States District Judge:

Plaintiff Ermaris Bio, PBC ("Ermaris"), sues the Trustees of Columbia University in the City of New York ("Columbia") to recover damages for Columbia's alleged breach of an agreement that granted Ermaris the option to negotiate a patent license. Ermaris seeks lost profits and other damages. Columbia moves to dismiss Ermaris's demand for lost profits as unduly speculative and its claim for breach of the implied covenant of good faith and fair dealing as duplicative of the breach-of-contract claim. For the reasons that follow, the Court grants Columbia's motion.

## I. Background

### A. Facts[1]

Kevin McLure founded Ermaris with the aim of developing an oral medication to treat retinal diseases that cause blindness. Compl. ¶¶ 1, 16. McLure had previously been a consultant

---

[1] The Court takes these factual allegations from the Complaint. *See* Dkt. 1 ("Compl."). In considering Columbia's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court accepts the Complaint's factual allegations as true and draws all reasonable inferences in

for SciMount Therapeutics ("SciMount"), which had been studying whether a molecule called (R)-44[2] could be used to treat people suffering from those diseases. *Id.* ¶¶ 17-20. To perform those studies, SciMount entered into a licensing agreement with Columbia for rights to a patent owned by Columbia covering molecules including (R)-44. *Id.* ¶¶ 19-20. Though its research yielded promising results, *id.* ¶ 22, SciMount opted not to invest in the preclinical studies that were required to submit an Investigational New Drug ("IND") application to the Food and Drug Administration ("FDA"), *id.* ¶¶ 23-26. Instead, SciMount gave up the project and returned the rights to (R)-44 to Columbia to permit McLure to "independently pursue [(R)-44's] licensing and development." *Id.* ¶¶ 26-27. McLure formed Ermaris for that purpose. *Id.* ¶ 28.

Like SciMount, Ermaris needed to license the (R)-44 patents from Columbia in order to conduct the preclinical studies that were required for an IND application. *Id.* ¶¶ 35-36. On November 24, 2023, Columbia executed an agreement granting Ermaris an "exclusive option to negotiate with Columbia in good faith for a license to patents relating to the (R)-44 molecule" (the "Option Agreement"). *Id.* ¶¶ 37-38. Ermaris agreed to fulfill five conditions precedent before it could exercise that option, including that, by the end of the nine-month option period, it would provide Columbia with a "complete business plan acceptable to Columbia, acting reasonably and in good faith." Option Agreement at 3-4; Compl. ¶ 39. Columbia agreed not to negotiate, license, grant any option, or "directly or indirectly" commercialize the patents at issue to any third-party other than a non-profit before the end of the option period. Option Agreement at 5; Compl. ¶ 46.

---

Ermaris's favor. *See Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). The Court may consider documents attached to the Complaint or incorporated into it by reference, such as the Option Agreement, Dkt. 46-1 ("Option Agreement"). *See* Fed. R. Civ. P. 10(c); *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013); *La Vigne v. Costco Wholesale Corp.*, 284 F. Supp. 3d 496, 502 (S.D.N.Y. 2018), *aff'd*, 772 F. App'x 4 (2d Cir. 2019).

[2] (R)-44 is known by other names including (R)-ACPHS-62, (R)-50, SMP-110, ERM-001, and ERM-123. Compl. ¶ 2 n.1.

During the option period, McLure raised funds, obtained quotes for conducting preclinical studies, retained a chemistry manufacturing and controls specialist, paid to maintain the patents, and hired consultants to develop clinical and non-clinical plans. Compl. ¶¶ 47-50, 87-88. Meanwhile, two Columbia professors acting on the university's behalf won grant funding from the National Eye Institute[3] to perform experiments on (R)-44.  *Id.* ¶¶ 30 n.3, 32, 51-52, 57.  The professors had applied for the grant in approximately the summer of 2023, before Columbia and Ermaris executed the Option Agreement.  *Id.* ¶ 51.  In approximately June 2024, the National Eye Institute awarded nearly $475,000 to the professors' laboratories and nearly $300,000 in indirect costs to Columbia.  *Id.* ¶ 52.  Under that award's terms, if the professors obtained positive results from their experiments, they would be eligible for a second grant of $5 million to perform the IND-enabling preclinical studies, and Columbia itself would be eligible to be awarded an additional $3,150,000 in indirect costs.  *Id.* ¶¶ 53-55, 67.  As alleged, the professors and Columbia had a high likelihood of earning the second funding round because, as they knew, the research they promised to perform in the first round already had been proved successful by SciMount.  *Id.* ¶¶ 57-58, 64-66.

When McLure learned that Columbia won the grant, he was "shock[ed]" to discover that Columbia "had deceived him by not disclosing the NIH grant" to him and "had deceived the NIH by applying for a grant to conduct experiments that Columbia knew had been previously successfully conducted" by SciMount, in violation of NIH regulations.  *Id.* ¶ 69; *see id.* ¶ 60 ("Under NIH regulations, researchers are not permitted to request grants for experiments they know have already been successfully conducted.").  Ermaris nevertheless sought to exercise its

---

[3] The National Eye Institute is part of the National Institutes of Health ("NIH").  Compl. ¶ 51.

option. On August 16, 2024, McLure emailed a proposed business plan to Columbia. *Id.* ¶ 72. According to Ermaris, the proposed plan "should have been acceptable to Columbia because it was substantially similar to the business plan SciMount submitted in connection with its agreement with Columbia, which Columbia accepted." *Id.* ¶ 74. Yet on the same day that McLure submitted his business plan, Columbia rejected it, claiming only that it was similar to the (R)-44 research proposed by the two Columbia professors who had won the NIH grant. *Id.* ¶ 75.

Ermaris alleges that Columbia turned down its business plan because it would have put Ermaris and Columbia in direct competition to develop (R)-44. *Id.* ¶¶ 76-77. As alleged, Columbia wanted to use the NIH funding it had just been awarded to conduct the (R)-44 studies itself, but Ermaris was two years ahead of Columbia in its research, so allowing Ermaris's research to further proceed "would have jeopardized Columbia's eligibility for" a combined "$8.15 million in second phase funding from NIH." *Id.* ¶¶ 76-78. In addition, if Columbia developed (R)-44 itself using the NIH funds, it would keep more "equity in the overall investment, rather than share it with [Ermaris]." *Id.* ¶ 82.

**B.  Procedural History**

Ermaris filed this action on May 2, 2025. Dkt. 1. The First Cause of Action alleges breach of contract, Compl. ¶¶ 91-96, and the Second Cause of Action alleges breach of the implied covenant of good faith and fair dealing, *id.* ¶¶ 97-101. Ermaris seeks lost profits of at least $1 billion, other damages, fees and costs, and "a determination that [Ermaris] is entitled to the right of first refusal on any future licenses that Columbia may grant with respect to the (R)-44 molecule or any similar molecule." *Id.* at 13-14. On July 11, 2025, Columbia moved to dismiss Ermaris's demand for lost profits and its Second Cause of Action. Dkts. 15, 16 ("Motion"). Ermaris filed

4

its brief in opposition on July 28, 2025.  Dkt. 17 ("Opposition").  Columbia replied on August 4, 2025.  Dkt. 18 ("Reply").

## II.  Legal Standard

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations."  *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

## III.  Discussion

### A.  Ermaris Does Not Allege Lost Profits with Reasonable Certainty.

New York law governs the Option Agreement.  *See* Option Agreement at 5; Motion at 1; Opposition at 1.  Lost profits may be "either general or consequential damages, depending on the nature of the 'lost profits' sought."  *Optima Media Grp. Ltd. v. Bloomberg L.P.*, No. 17 Civ. 1898 (AJN), 2021 WL 1941878, at *20 (S.D.N.Y. May 14, 2021) (quoting *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109-10 (2d Cir. 2007)).  They are "consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements."  *Id.* (quoting *Tractebel Energy Mktg.*, 487 F.3d at 109).  For instance, when Pepsi's exclusive bottler and distributor for a designated region of Peru lost sales to third parties not

governed by the agreement, the distributor's lost profits were consequential damages resulting from Pepsi's failure to stop those competitors from encroaching on the distributor's territory. *See Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 322 (S.D.N.Y. 2009). "'By contrast, when the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are general damages' because they 'are the direct and probable consequence of the breach' and 'precisely what the non-breaching party bargained for.'" *Optima Media Grp.*, 2021 WL 1941878, at *20 (quoting *Tractebel Energy Mktg.*, 487 F.3d at 109). For example, the lost profits from unpaid license fees set out by a payment schedule in the underlying contract are general damages. *Id.* (citing *Am. List Corp. v. U.S. News & World Rep., Inc.*, 549 N.E.2d 1161, 1164 (N.Y. 1989)). The core of the distinction, therefore, "is whether the lost profits flowed directly from the contract itself or were, instead, the result of a separate agreement with a nonparty." *Biotronik A.G. v. Conor Medsystems Ireland, Ltd.*, 11 N.E.3d 676, 681-82 (N.Y. 2014) (collecting cases).

The allegations in the Complaint make clear that Ermaris is seeking lost profits in the form of consequential damages.[4] Its alleged losses stem from the collateral sales it anticipated making in the future with third parties, not from any amount of profit it bargained for with Columbia. Compl. ¶ 96, at 13-14; *see Tractebel Energy Mktg.*, 487 F.3d at 109 (explaining that "[l]ost profits

---

[4] In its opposition brief, Ermaris does not take a position as to whether its demanded lost profits are properly characterized as compensatory or consequential damages. *See* Opposition at 5-12. The Complaint, however, does not equivocate, calling the lost profits "compensatory damages" and further seeking separate "consequential damages" in the Prayer for Relief. Compl. at 13-14. Notwithstanding the Complaint's label, the Court construes the lost profits as consequential damages. As President Lincoln recounted, calling a calf's tail a leg did not mean the calf had five legs. *See* George W. Julian, *Reminiscences of Abraham Lincoln by Distinguished Men of His Time* 62 (Allen Thorndike Rice ed., 1888). Accordingly, the Court need not consider Columbia's alternative argument for dismissal of Ermaris's lost-profits demand based on the premise that the sought lost profits are compensatory damages. *See* Motion at 11-12.

are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements"); *SG Blocks, Inc. v. Osang Healthcare Co. Ltd.*, No. 21 Civ. 1990 (WFK), 2022 WL 16787936, at *3 (E.D.N.Y. Sept. 22, 2022) (characterizing lost profits as consequential damages because "[t]he alleged losses stem from the sales [the plaintiff] could have made with third parties, which are collateral to the [supply agreement]"). Ermaris's theory of lost profits is that, had Columbia performed, Ermaris would have earned at least $1 billion in profits by taking "a potentially best-in-class drug" into a $20 billion market, Compl. ¶ 96, at 13-14; *accord id.* ¶ 90, thanks to Ermaris's "effective molecule and a ready-made plan with consultants, [Good Manufacturing Process] material and funding strategy." Opposition at 9. These "speculative profits on collateral transactions" are quintessential consequential damages. *Tractebel Energy Mktg.*, 487 F.3d at 110.

New York law imposes "stringent requirements" on the recovery of future lost profits. *Trademark Rsch. Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 332 (2d Cir. 1993). "[T]he damages may not be merely speculative, possible or imaginary." *Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (quoting *Kenford Co. v. Cnty. of Erie*, 493 N.E.2d 234, 235 (N.Y. 1986)). Ermaris must allege facts that show the lost profits to be "reasonably certain and directly traceable to the breach," *Trademark Rsch. Corp.*, 995 F.2d at 332 (quoting *Kenford Co.*, 493 N.E.2d at 235), and "capable of measurement based upon known reliable factors without undue speculation." *Schonfeld*, 218 F.3d at 172 (quoting *Ashland Mgmt. Inc. v. Janien*, 624 N.E.2d 1007, 1010 (N.Y. 1993)). "Projections of future profits based upon 'a multitude of assumptions' that require 'speculation and conjecture' and few known factors do not provide the requisite certainty." *Id.* (quoting *Kenford Co.*, 493 N.E.2d at 236). Finally, Ermaris must show that the "particular

damages were fairly within the contemplation of the parties to the contract at the time it was made." *Trademark Rsch. Corp.*, 995 F.2d at 332 (quoting *Kenford Co.*, 493 N.E.2d at 235).

In sum, a party is entitled to recover lost profits "only if (1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties." *Tractebel Energy Mktg.*, 487 F.3d at 109. Moreover, a new business demanding lost profits faces "an even stricter standard," *Trademark Rsch. Corp.*, 995 F.2d at 332, because of the "obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty," *id.* (quoting *Kenford Co.*, 493 N.E.2d at 235). "[C]ourts often address the issue of lost profits at the summary judgment stage," but "New York courts have dismissed claims for lost profits where the pleadings suggest that an award of lost profits would require an unreasonable level of speculation." *Robin Bay Assocs., LLC v. Merrill Lynch & Co.*, No. 07 Civ. 376 (JMB), 2008 WL 2275902, at *7 (S.D.N.Y. June 3, 2008); *see ACCD Glob. Agric. Inc. v. Perry*, No. 12 Civ. 6286 (KBF), 2013 WL 840706, at *6 (S.D.N.Y. Mar. 1, 2013) (collecting cases); *see also SG Blocks*, 2022 WL 16787936, at *4 (dismissing claim for lost profits); *Hi Bar Cap. LLC v. Getter*, No. 22 Civ. 1743 (ENV) (RML), 2025 WL 2989120, at *4-5 (E.D.N.Y. Oct. 12, 2025) (finding projections of lost profits "too speculative to predict with certainty"), *adopting in part*, 2024 WL 1530835 (E.D.N.Y. Feb. 21, 2024).

In *Robin Bay Associates, LLC v. Merrill Lynch & Co.*, the court granted in part a motion for judgment on the pleadings, dismissing a demand for lost profits based on the demand's "unreasonable level of speculation." 2008 WL 2275902, at *7; *see Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006) ("The standard for addressing a Rule 12(c) motion for judgment

8

on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim."). There, the plaintiff acquired an option to buy a plot of land in St. Croix to build a resort and casino. *Robin Bay Assocs.*, 2008 WL 2275902, at *1. In need of funds, the plaintiff hired Merrill Lynch to identify investors and secure financing agreements. *Id.* The plaintiff alleged that, after some friction, Merrill Lynch backed out, breaching their contract, causing the plaintiff to lose its casino license, and scaring away potential investors. *Id.* at *2. The plaintiff demanded more than $250 million in lost profits based on its would-be resort's projected earnings. *Id.* at *7. The court dismissed that demand as unduly speculative because it rested on a string of unsupported assumptions: that the plaintiff would have "obtained the necessary funding to purchase the land, secured the proper zoning and casino licenses, completed construction of the casino, and operated a profitable business for 5 years thereafter." *Id.* at *8. Those assumptions were all the more speculative given the infancy of St. Croix's casino industry, which meant the plaintiff could not rely on a "record of performance sufficient to project future profits." *Id.*

Ermaris's basis for lost profits is at least as speculative, even if the market for retinal-disease drugs is more developed than the St. Croix gaming industry, *see* Compl. ¶ 90. As alleged, Ermaris would earn profits from (R)-44 only after a long string of events. Their possible outcomes are indeterminable; any prediction would be merely the sum of "a multitude of assumptions" based on mere conjecture. *SG Blocks*, 2022 WL 16787936, at *4. For example, had Ermaris obtained the license for the (R)-44 patent, it would still need to develop or procure the (R)-44 drug substance before it could begin testing. Ermaris had negotiated with SciMount to use its Good Manufacturing Process-grade (R)-44 drug substance "to run both the IND-enabling preclinical studies and Phase

9

I clinical studies," but it is not clear whether the parties finalized any arrangement. Compl. ¶ 49.[5] The FDA's "elaborate and time-consuming regulatory regime" presents its own set of contingencies. *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 378 (2002) (Breyer, J., dissenting). First, Ermaris would need to obtain positive results from its preclinical studies. After that, it would need to submit a successful IND application to secure the FDA's permission to test the drug on humans. Only after multiple rounds of successful human testing would Ermaris be able to market its potential drug, at which point it would take even more good skill and fortune for Ermaris to see profits "not less than $1 billion." Compl. at 13. This level of "speculation and conjecture" does not provide a basis for recovering lost profits. *SG Blocks*, 2022 WL 16787936, at *4.

That is especially so where, at the time of Columbia's alleged breach, Ermaris was a new business with no customer base, tested business strategy, or product to support a lost-profits projection. *See Schonfeld*, 218 F.3d at 172-73; *see also SG Blocks*, 2022 WL 16787936, at *4. McLure created Ermaris approximately three months before entering the Option Agreement, Compl. ¶¶ 34, 37, and for the specific purpose of developing (R)-44, *id.* ¶ 28. Except for one unsupported assertion in its opposition brief that "[b]iotech startups routinely claim such damages despite FDA hurdles," Opposition at 9,[6] nowhere does Ermaris allege how it would calculate lost-

---

[5] The Complaint contradicts itself as to this fact. At one point, it alleges that Ermaris had negotiated with SciMount but does not allege that the negotiations concluded with an agreement. Compl. ¶ 49. At another, it alleges that Ermaris agreed with SciMount "to procure the drug substance that SciMount had already produced and to use the SciMount (R)-44 data." *Id.* ¶ 93. Even if Ermaris and SciMount had agreed to such an arrangement, that would not fix the Complaint's deficiency with respect to its lost-profits demand. *See Schonfeld*, 218 F.3d at 173.

[6] And of course, Ermaris may not amend its Complaint's factual allegations through briefing. *See, e.g.*, *A Star Grp., Inc. v. Manitoba Hydro*, 621 F. App'x 681, 683 (2d Cir. 2015) ("[A] party may not amend its pleadings through statements in its briefs." (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)); *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 562 (S.D.N.Y. 2011) ("It is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss." (citation modified)).

profits projections, or which, if any, companies are sufficiently comparable to provide a profit history that might guide the analysis. *See Washington v. Kellwood Co.*, No. 05 Civ. 10034 (SN), 2016 WL 3920348, at *7 (S.D.N.Y. July 15, 2016), *aff'd,* 714 F. App'x 35, 40-41 (2d Cir. 2017). Therefore, "there is simply no basis for the [C]ourt to determine lost profits at this point or any other stage of the litigation because such a calculation would require a high degree of speculation." *Robin Bay Assocs.*, 2008 WL 2275902, at *8; *see Schonfeld*, 218 F.3d at 173 (affirming summary judgment that dismissed a demand for lost profits based on profits that "were purely hypothetical, stemming from the sale of untested programming to a hypothetical subscriber base, sold to advertisers at a hypothetical price and supported by hypothetical investors and carriers" (citation modified)); *see also Britestarr Homes, Inc. v. Piper Rudnick LLP*, 256 F. App'x 413, 414-15 (2d Cir. 2007) (summary order) (affirming the district court's rejection of a theory of lost profits based on "improperly speculative assumptions").

      Neither does Ermaris allege any facts indicating that the parties contemplated lost profits as part of the Option Agreement. Where a contract is silent on lost profits, New York courts apply a "commonsense rule" and evaluate "what the parties would have concluded had they considered the subject." *Kenford Co.*, 493 N.E.2d at 236. The Option Agreement did not address lost profits, *see generally* Option Agreement, nor does the Complaint allege that the parties considered the topic, *see generally* Complaint. Moreover, the Option Agreement did not even promise that Ermaris would receive a license at the end of the option period; it allowed Ermaris only to *negotiate* for such a license. *See* Option Agreement at 1. Common sense does not dictate that the parties would have concluded that Columbia would be on the hook for more than $1 billion in this situation had they considered the matter at the time of entering the contract. *See Ashland Mgmt.*, 624 N.E.2d at 1011 (finding, by contrast, that the "sophisticated" parties not only contemplated

consequential damages but "fully debated and analyzed" them and calculated projections for them during "extended contract negotiations"). And lastly, to the extent Ermaris seeks to introduce new facts in its opposition brief with respect to this analysis, *see* Opposition at 12, the Court declines to consider them. *See Munck v. Simons Found.*, No. 23 Civ. 9188 (LAP), 2024 WL 4307776, at *5 (S.D.N.Y. Sept. 26, 2024) ("Courts routinely decline to review factual allegations which appear for the first time in an opposition brief where they appear nowhere in the complaint."); *see also supra* n. 6.

Accordingly, the Court grants Columbia's motion to dismiss Ermaris's demand for lost profits.

**B.     Ermaris's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Duplicates its Breach-of-Contract Claim.**

New York law permits a plaintiff to bring a claim for breach of the implied covenant of good faith and fair dealing, in addition to a breach-of-contract claim, "only if it is based on allegations different from those underlying the breach of contract claim, and the relief sought is not intrinsically tied to the damages that flow from the breach of contract." *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022). Thus, the Court must dismiss the implied-covenant claim as duplicative of the breach-of-contract claim unless Ermaris has alleged that its claim for breach of the implied covenant relies on different facts from its claim for breach of contract and seeks damages that are not intrinsically tied to the breach-of-contract claim. *See id.*; *see also State St. Glob. Advisors Tr. Co. v. Visbal*, 677 F. Supp. 3d 209, 261 (S.D.N.Y. 2023).

Ermaris's two claims both seek to recover for Columbia's denial of the option to negotiate a license. The breach-of-contract claim alleges that Columbia breached by "refusing to negotiate an option to license in good faith," Compl. ¶ 94, allowing its faculty members to apply for a grant from the National Eye Institute, concealing from Ermaris in bad faith the scope of the preclinical

12

work its faculty planned to pursue upon winning the grant, and "allowing [Ermaris] to spend extraordinary resources" while "knowing that Columbia would renege on the [Option] Agreement if a more profitable opportunity presented itself," *id.* ¶ 95.  The claim for breach of the implied covenant shifts the emphasis and specifies additional details, but ultimately alleges the same conduct: "Columbia sought to prevent performance of the [Option] Agreement and/or withhold its benefits from [Ermaris] by refusing to accept [Ermaris's] business plan in bad faith."  *Id.* ¶ 99. And both claims allege the same injury, *i.e.*, Ermaris's inability to obtain a license for the (R)-44 molecule based on Columbia's rejection of its business plan.

    Ermaris's attempts to distinguish its claims are unavailing.  In its brief, Ermaris insists that the breach-of-contract claim "focuses on Columbia's refusal to negotiate an option to license in good faith," while the covenant claim "addresses Columbia's affirmative acts to undermine the [Option] Agreement's purpose—by developing the same molecule with NIH funds."  Opposition at 14.  In other words, Ermaris contends that its breach-of-contract claim relies on Columbia's "non-performance," whereas Columbia breached the implied covenant "through bad faith manipulation and self-dealing."  *Id.* at 17.  As discussed above, however, the Complaint does not make such a distinction.  But more importantly, even if it did, Ermaris has not alleged that it suffered any injury from Columbia's alleged breach of the implied duty that is separate from the injury resulting from Columbia's alleged "non-performance."  *Id.*  Indeed, the Complaint does not allege any scenario in which Columbia performed the contract but Ermaris nevertheless suffered an injury from Columbia's "bad faith manipulation and self-dealing."  *Id.*

    Ermaris thus fails to plead distinct facts and damages underlying a breach of the implied covenant of good faith and fair dealing.  Accordingly, the Court grants Columbia's motion to dismiss Ermaris's Second Cause of Action as duplicative of the First Cause of Action.

### C. Leave to Amend

Ermaris seeks leave to amend in the event the Court grants any part of Columbia's motion. Opposition at 19-20. "Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend shall be freely given when justice so requires, it is within the sound discretion of the district court to grant or deny leave to amend." *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (citation modified). "Leave to amend may be denied for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Id.* (citation modified). Ermaris does not set out how it would amend its Complaint, *see generally* Opposition, so the Court is limited in its ability to evaluate whether a potential amendment would be futile. But neither has Columbia shown that amendment would prejudice it or reflect Ermaris's undue delay or bad faith. *See generally* Reply. Accordingly, Ermaris may amend its Complaint. The Court emphasizes that Ermaris should file an Amended Complaint only if it believes it is able to remedy the pleading deficiencies identified herein.

### IV. Conclusion

For the foregoing reasons, the Court grants Columbia's motion and dismisses Ermaris's Second Cause of Action and demand for lost profits without prejudice. The Court grants leave to amend the Complaint. In the event Ermaris decides to file an Amended Complaint, it must do so within two weeks of this Opinion and Order.

SO ORDERED.

Dated: February 25, 2026  
New York, New York

_____  
JOHN P. CRONAN  
United States District Judge